# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| JESUS MONTALVO, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:08-CV-2674 |
| | § | |
| CITY OF HOUSTON, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

In this employment discrimination suit, Defendant City of Houston ("City") has filed a Motion for Summary Judgment [Doc. # 40] ("Motion"). Plaintiff Jesus Montalvo has filed a response,[1] and the City has replied.[2] Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court concludes that Defendant's Motion should be **granted**.[3]

---

[1] Plaintiff Jesus Montalvo's Response and Opposition to Defendant City of Houston's Motion for Summary Judgment [Doc. # 47] ("Response").

[2] Defendant City of Houston's Reply Memorandum in Further Support of its Motion for Summary Judgment and in Response to Plaintiff's Opposition to Summary Judgment [Doc. # 53] ("Reply").

[3] Montalvo originally brought suit as one of 23 plaintiffs in *Zamora v. City of Houston*, 4:07-CV-4510. On August 28, 2008, the Court severed Montalvo's claims from the *Zamora* suit because Montalvo's complaints were significantly different from those of the other *Zamora* plaintiffs.

I.  **BACKGROUND**

Plaintiff Jesus Montalvo is a Hispanic male born January 8, 1957.  Montalvo begins his employment with the Houston Police Department ("HPD") in 1994, serving HPD in the Patrol, Records, the Training Academy, and Recruiting Departments.  He left employment with HPD effective October 3, 2008.  Montalvo alleges that he was constructively discharged.  He brings claims for discrimination on the basis of race, age, and gender, as well as claims for illegal retaliation.

In 2006, while Montalvo was assigned to teach at the Training Academy, Captain Mary Lentschke became captain in charge of the Academy.  Plaintiff appears to allege that Lentschke's arrival at the Training Academy was a significant cause of the problems leading to this lawsuit.

On July 25, 2006, while teaching an evening class, Montalvo removed a student, Sergeant R. C. Speckman, from his classroom.   Montalvo states that Speckman, a white male officer, was agitated and made disruptive, hostile comments criticizing Montalvo, making it nearly impossible for Montalvo to continue teaching the class.[4]  Speckman, who filed a complaint against Montalvo as a result of the incident, states that he had asked questions of Montalvo but was not disruptive, and

---

[4]      Response, at 12; Memorandum from J. Montalvo to G. Ware re: Student Removal from Class, dated July 26, 2006 (Exhibit 4 to Response).

that Montalvo's removal of Speckman from the course was without just cause and was unprofessional.[5]   As a result of the incident, both the student and Montalvo were disciplined with one-day suspensions.  Montalvo alleges that Captain Mary Lentschke recommended his suspension.[6]

Montalvo appealed the suspension, which ultimately was reversed on March 15, 2007.[7]  Before the reversal, however, the suspension was noted in his evaluation for the period ending February 28, 2007, resulting in his evaluation being lowered from "strong" to "effective" in certain areas.[8]  Montalvo blames Lentschke for ordering that the suspension be included in his evaluation.[9]  Montalvo was concerned that the evaluation would affect his pay, and rebutted the evaluation to Assistant Chief George Buenik, who then was in charge of the Training Division and Human Resources Division.[10]   Montalvo made an internal complaint against Lentschke on April 3,

---

[5]     Memorandum from R.C. Speckman to H. Hurtt re: Improper Conduct of Officer J. Montalvo, dated August 2, 2006 (Exhibit 2 to Singer Affidavit).

[6]     Deposition of Jesus Montalvo (Exhibit 1 to Response), at 122.

[7]     Final Order of the Commission, dated Mar. 15, 2007 (Exhibit 5 to Response) (overruling Plaintiff's one-day suspension).

[8]     Report of Employee Efficiency Rating re J. Montalvo, dated Feb. 28, 2007 (Exhibit 6 to Response).

[9]     Response, at 12.

[10]    Buenik states that the evaluation has no effect on an officer's pay.  Affidavit of Assistant Chief of Police George Buenik in Support of Defendant City of Houston's
(continued...)

2007.[11]

On June 15, 2007, Captain Lentschke replaced Montalvo's immediate supervisor, Sergeant Steve Barnett, with "a female acquaintance, Sergeant Diana Poor."[12] Montalvo alleges that Barnett was replaced because Lentschke "did not feel [he] was the right person for the job."[13] Montalvo also alleges that J.T. Shallington, "another older male," was asked by Lentschke to leave the Training Academy "because he did not fit the right image for the cadet-training."[14] Montalvo does not specify the race or age of either Barnett or Shallington.

Montalvo alleges that once Sergeant Diana Poor became his immediate

---

[10]   (...continued)
Motion for Summary Judgment (Appendix IV to Motion) ("Buenik Affidavit"), at 1, ¶ 3 ("Pay increases for police officers are negotiated between the City and the Houston Police Officers' Union . . . . The agreed upon pay increases are then memorialized in the Meet and Confer Agreement between the City and the Union. A police officer's performance evaluation, known as a 'JPR' in the police department, will not affect an officer's pay increase.").

[11]   Memorandum from J. Montalvo to H. Hurtt re: Complaint of Harassment Issue Record # 29447-2007, dated April 3, 2007 (Exhibit 15 to Singer Affidavit) (sealed) (complaining that, since he appealed his one-day suspension, Lentschke had retaliated against him by subjecting him to close scrutiny and having him admonished for issues such as dim lights in his office).

[12]   Response, at 13.

[13]   *Id.*

[14]   *Id.*

supervisor, he was "singled out."[15]  He notes that Sergeant Poor was younger than he,

and was female and Caucasian.  As evidence that he was "singled out" by Sergeant

Poor, Montalvo cites two incidents for which he received a Supervisory Intervention

("SI") form in his personnel file.[16]  First, on August 20, 2007, Montalvo received an

SI from Sergeant Poor for improperly filling out paperwork that was submitted to

Louisiana State University (the "LSU paperwork").  Second, on an unspecified date,

Montalvo received another SI from Sergeant Poor for disobeying her directive to wear

his uniform, rather than a suit, while doing a media interview in the department's

parking lot.  Montalvo also claims that other employees had complained that Sergeant

Poor was strict and "talked down" to them.[17]

On August 22, 2007, Montalvo filed an internal complaint against Poor and

---

[15]     Response, at 13.

[16]     Plaintiff does not cite to either of the SI forms, which apparently are not in the record.
Defendant has submitted evidence that an SI is not punitive.  In particular, an excerpt
from the Meet and Confer Agreement between the Houston Police Department and
the officers' union states as follows:

> Supervisory Intervention shall be non-punitive and is not to be
> considered discipline in any form or fashion.  It is intended to correct
> or modify actions/behavior through positive encouragement,
> counseling, training, or reeducation.  It is not intended to punish or
> harm an officer in any way.

2001 Meet and Confer Agreement and Amendments of 2003 and 2004, at 28, ¶ 8
(Exhibit 8 to Affidavit of Karen Singer (Appendix I to Motion)).

[17]     Response, at 16.

Lentschke.[18]  His three-page complaint detailed the events surrounding the SI issued to Montalvo for errors in the LSU paperwork, and stated his belief that Sergeant Poor was harassing him by going on a "fishing expedition" to find errors in Montalvo's job performance.[19]  Montalvo filed a supplemental complaint on September 28, 2007.[20]  A department investigation concluded in November 2007 that Montalvo's complaints were unfounded.[21]

Montalvo states that because he "could not handle the discrimination," he requested that Buenik transfer him "to avoid continued retaliation."[22]  Buenik immediately granted Montalvo's request, transferring him on December 5, 2007, to a temporary assignment in the Recruiting Division.[23]

---

[18]    Memorandum from J. Montalvo to H. Hurtt re: Complaint of Harassment on Sergeant Diana Poor and Officer Mitchell Garcia, dated August 22, 2007 (Exhibit 14 to Singer Affidavit) ("Internal Complaint") (sealed).

[19]    *Id*.

[20]    Memorandum from J. Montalvo to H. Hurtt re: Supplement to Record of Complaint Issue Record # 2007-30285, dated September 28, 2007 (Exhibit 16 to Singer Affidavit) (sealed).

[21]    Investigation Summary from M. T. Hoesel to H. Hurtt re: Complaint of Officer J. Montalvo Issue # 30285-2007, dated November 15, 2007 (Exhibit 7 to Singer Affidavit) (sealed).

[22]    Response, at 16.

[23]    Email String dated Dec. 5, 2007 (Exhibit 16 to Response).  During the temporary assignment, Montalvo continued to be assigned to the Academy.  *Id*.

On December 11, 2007, Montalvo filed a Charge of Discrimination with the EEOC alleging race and age discrimination.[24]   Buenik ordered that Plaintiff be "shielded" in Recruiting pending outcome of the EEOC investigation.[25]

On May 7, 2008, while Montalvo was shielded in Recruiting, Montalvo's supervisor, Captain Dwayne Ready, sent an email to Buenik about Montalvo's job performance:

> My supervisors and I are struggling to get Officer Montalvo to complete basic tasks and follow simply [sic] instructions.  Management efforts have been documented and meetings were held to encourage compliance. In order to curtail wasted time and energy on this front, I assigned him to the phones. . . .
>
> Needless to say, Officer Montalvo disagrees with the assignment even though we did not change his days off or shift hours.  He indicated that he would like an audience with you to discuss it.  The lieutenant and sergeant met with him prior to my meeting with him. Are you inclined to meet with him?[26]

Buenik responded, "It is probably time for him to move on to another assignment."[27]

Based on the complaints about Montalvo's job performance, Buenik decided

---

[24]   Charge of Discrimination (Exhibit 18 to Response) ("EEOC Charge").  The EEOC Charge does not allege gender discrimination.

[25]   Memorandum from G. Buenik to J. Montalvo re: Shielding Plan, dated Feb. 18, 2008 (Exhibit 20 to Response).

[26]   Email Chain between D. Ready and G. Buenik, dated May 7, 2008 (Exhibit 3 to Buenik Affidavit).

[27]   *Id.*

to pursue an involuntary transfer for Montalvo.[28]   Therefore, soon after receiving

Ready's email, Buenik sent out an email on May 9 asking if his subordinates had

proper documentation to support an involuntary transfer:

> I am considering the involuntary transfer of Officer Montalvo if you
> have documentation to support it.  Please submit a summary to support
> your position.  I will review the facts and make a decision at that time.[29]

The email was sent to Lentschke and Ready, and was copied to four other persons.

In response, Beunik received several memoranda regarding Montalvo's job

performance.  Captain Ready sent a memorandum reporting that Montalvo had been

reassigned to phone duties effective May 13, 2008 because of, among other things,

Montalvo's failure to comply with work product expectations and his argumentative

attitude toward his supervising officers.[30]   The problems referenced by Ready

occurred in April and May 2008, while Montalvo was shielded in Recruiting.  Ready

did not provide details about Montalvo's performance issues, but referred Buenik to

---

[28]   Buenik states that, because Montalvo was being shielded from Lentschke and the
Training Academy as a result of his EEOC Charge, he could not be returned to the
Academy, and therefore "I thought it was time to transfer him to another position
outside my command, which would result in an involuntary transfer."  Buenik
Affidavit, at 3, ¶ 9.

[29]   Email from G. Buenik to M. Lentschke and D. Ready, dated May 9, 2008 (Exhibit 4
to Buenik Affidavit).

[30]   Memorandum from D. Ready to G. Buenik re: Involuntary Transfer of Senior Police
Officer J. Montalvo, Employee # 84805, dated May 15, 2008 (Exhibit 5 to Buenik
Affidavit).

a separate memorandum prepared by Sergeant Davis (the "Davis Memorandum").

The Davis Memorandum, authored by Sergeant Denise Davis, provides seven pages of detailed information about Montalvo's performance problems in Recruiting.[31] The memorandum discusses eight recruiting files in which Montalvo made errors, and references each file by control number. The errors in many of these files were brought to Montalvo's attention during an April 14, 2008, meeting among Montalvo, Davis, and Lieutenant Rusinksi of the Human Resources Division.  Davis states that the meeting was for purposes of "retraining [Montalvo] on termination letter procedures and criteria,"[32] which were one of his job duties in Recruiting.  She states that Rusinski returned approximately twelve application files to Montalvo at the meeting, "reviewing each one" and "provid[ing] step-by-step procedures in handling each of the folders."[33]  The meeting was precipitated because

> [p]rior to this meeting, Officer Montalvo repeatedly turned in letters [terminating an applicant's application] with errors in the applicant's name, date of birth, age, sex, race and address, despite the fact that officers had been advised to proofread their letters prior to submitting them.  Also, letters [Montalvo] has submitted reflect he has failed to

---

[31]  Memorandum from D. Davis to F. Rusinski re: Work Product of Senior Police Officer J. Montalvo, dated May 14, 2008 (Exhibit 5 to Buenik Affidavit) ("Davis Memorandum").

[32]  *Id*. at 1.

[33]  *Id*.

> contact the applicant, a necessary requirement in the application process. He has repeatedly used the wrong termination codes despite letters being returned to him with the required corrections noted and emails being sent to all preliminary officers advising of proper procedures in handling terminations.[34]

The Davis Memorandum then explains in detail the errors Montalvo made in multiple files.  For example, one file returned to Montalvo at the meeting had been returned to him four previous times; Montalvo had repeatedly made errors such as listing incorrect dates and stating inaccurate reasons for the applicant's termination.[35]  In the case of another applicant, Montalvo noted in the file that the applicant did not meet the education requirements, when in fact her upcoming honorable discharge from the service would have satisfied the requirement.[36]  Montalvo's handling of the case could have caused HPD to lose a favorable applicant; Davis subsequently attempted to personally contact the applicant.[37]  In a similar case regarding another applicant serving in the military, Montalvo resisted instructions to process the applicant before his discharge, stating that a letter from the applicant's commanding officer was "no

---

[34]    *Id.*

[35]    *Id.* at 1-2.

[36]    *Id.* at 4.

[37]    *Id.*

guarantee" that the applicant would receive an honorable discharge.[38]  When he again was instructed to proceed with the application, Montalvo "stated that it was a waste of time and then advised that his applicant had just requested to voluntarily withdraw from the process."[39]  Davis advised Montalvo that she would take the folder and, upon personally contacting the applicant, learned that he was enthusiastic about his application and wanted to continue in the process; he was scheduled for an interview, for which he arrived 30 minutes early.[40]

Davis also states that she had not asked Montalvo to do anything other officers had not been asked to do, but that other officers who were asked to make corrections actually made the changes she asked them to make.[41]  The Davis Memorandum concludes, "The decision to have Officer Montalvo answer phones instead of processing applicants was done to protect the City of Houston and Houston Police Department from future litigation filed by applicants whose rights could have been

---

[38]     *Id*. at 5.

[39]     *Id*.

[40]     *Id*.

[41]     *Id*. at 6 ("No one has ever refused to make a correction and turned it back in the same way it was submitted the first time, especially when a lieutenant has instructed the officer how to complete the letter.").

violated."[42]

Lentschke also submitted a memorandum to Buenik supporting Montalvo's involuntary transfer.[43] Lentschke's memorandum does not recount specific incidents, but relies on and attaches memorandum from other officers (Lieutenant Waltmon, Lieutenant Torres, and Sergeant Poor), which Lentschke states "outlin[e] a continuous pattern of negative and disruptive behavior on the part of Officer Montalvo."[44] Her memorandum further states that supervisory efforts to improve Montalvo's performance, and to correct his negative behavior, had failed. The attached memorandum from Lieutenant Waltmon discusses Montalvo's job performance from April through August 2007, and reports that during that period Montalvo had been verbally counseled for various infractions.[45] Waltmon also discusses the SI regarding the LSU paperwork, as well as an incident in August 2007 when he visited one of Montalvo's classes and found that Montalvo did not have the necessary class materials. Waltmon concludes that Montalvo "has a history of not working well with

---

[42]    *Id.* at 7.

[43]    Memorandum from M. Lentschke re: Request for Involuntary Transfer of Officer J. Montalvo, Employee #84805, from the Training Division, dated May 14, 2008 (Exhibit 5 to Buenik Affidavit).

[44]    *Id.*

[45]    Memorandum from J. Waltmon to M. Montalvo re: Recommendation of the Removal of Officer J. Montalvo PR # 84805 from the Training Division, dated May 13, 2008 (Exhibit 5 to Buenik Affidavit).

supervisors," despite genuine efforts to help improve his performance, and his job performance as an instructor at the Academy was unacceptable.[46]  The attached memorandum from Lieutenant Torres contains no first-hand information about Montalvo's performance, but instead states that "numerous" employees had approached him to "voice their dismay and concern that the in-service unit's esprit de corps would be destroyed if [Montalvo] were allowed to return [to the Training Unit]."[47]  Finally, Sergeant Poor's memorandum covers Montalvo's job performance during 2007, discussing the same incidents recounted by Lieutenant Waltmon.  Poor concludes that Montalvo had a history of not working well with supervisors, had not responded to efforts to help him improve his performance, and that his job performance in the In-Service Unit was unacceptable and rendered him "no longer suitable for the assignment."[48]

Buenik admits that he did not further investigate the complaints against

---

[46]     *Id*. at 3.

[47]     Memorandum from J. Torres to M. Montalvo, re: Request for Involuntary Transfer of Officer J. Montalvo, employee # 84805, from the Training Division, dated May 13, 2008 (Exhibit 5 to Buenik Affidavit).

[48]     Memorandum from D. Poor to M. Montalvo, re: Request for Involuntary Transfer of Officer J. Montalvo, PR # 84805 from the Training Division, dated May 13, 2008 (Exhibit 5 to Buenik Affidavit).

Montalvo, but accepted the accounts of his subordinates.[49]

On May 28, 2008, Montalvo was officially notified by Buenik that he would receive an involuntary transfer within thirty days.[50]  Montalvo was informed that he had twenty days to arrange a transfer to any division with an existing vacancy and, if he did not secure a voluntary transfer within twenty days, he would be involuntarily transferred ten days later to a patrol assignment.

On June 16, 2008, Montalvo filed a second Charge of Discrimination with the EEOC, alleging retaliation.[51]  Montalvo claimed that his involuntary transfer to patrol would cause him to lose his shift and his weekends off, and that he was being retaliated against for filing his first EEOC Charge.[52]

On July 26, 2008, Montalvo was involuntarily transferred to the Juvenile

---

[49]    Buenik Deposition (Exhibit 7 to Response), at 114.

[50]    Memorandum from G. Buenik to J. Montalvo re: Involuntary Transfer of Senior Police Officer J. Montalvo, Employee # 84805, dated May 28, 2008 (Exhibit 7 to Buenik Affidavit).

[51]    Charge of Discrimination, dated June 16, 2008 (Exhibit 17 to Singer Affidavit) ("Second EEOC Charge").

[52]    Buenik states, "My decision to involuntarily transfer [Montalvo] was not because he had complained of harassment and retaliation, but because he clearly indicated to me that he did not want to return to the Academy, and because his supervisors at the Academy and in the Recruiting Unit indicated that he was a disruptive presence who was interfering with the goals of the units he was assigned to.  Mr. Montalvo's repeated failure to follow supervisory directions in his position at the Training Academy made him unsuitable for that permanent assignment."  Buenik Affidavit, at 4-5, ¶ 15.

Division, with duty hours from 1500 to 2300, and Thursdays and Fridays off.[53]
Because the work location was 45 miles from his home, Montalvo requested that he
instead be transferred to Westside patrol; he reported for duty at Westside on July 17,
2008.[54]  The assignment to Westside patrol required Montalvo to work nights and
weekends.[55]  Upon his transfer to Westside patrol, his shielding plan was terminated.[56]

On or about August 14, 2008, Montalvo notified his superiors that he would
resign from HPD effective October 3, 2008.  His separation from service was effective
on October 3, 2008.[57]

## II.    SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary
judgment, after adequate time for discovery and upon motion, against a party who
fails to make a sufficient showing of the existence of an element essential to the

---

[53]    Personnel Changes form dated July 28, 2008 (Exhibit 9 to Buenik Affidavit).

[54]    Memorandum from M. Montalvo to J. Montalvo re: Termination of Shielding Plan
Issued February 18,  2008, dated July 18, 2008 (Exhibit 23 to Response) (Montalvo
waived ten-day notice period regarding his transfer and reported to Westside Patrol
on July 17, 2008).

[55]    Email from P. Lew to G. Buenik, dated Aug. 1, 2008 (Exhibit 9 to Buenik Affidavit).

[56]    Memorandum from M. Montalvo to J. Montalvo re: Termination of Shielding Plan
Issued February 18,  2008, dated July 18, 2008 (Exhibit 23 to Response).  Plaintiff
signed a statement on the memorandum affirming that he understood that shielding
was being terminated and that he "ha[d] no additional comments or suggestions
regarding the handling of the shielding effort and the termination of the same."  *Id*.

[57]    Letter regarding Separation of Service (Exhibit 28 to Response).

party's case, and on which that party will bear the burden at trial.[58]  Summary

judgment "should be rendered if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law."[59]

For summary judgment, the initial burden falls on the movant to identify areas

essential to the non-movant's claim in which there is an "absence of a genuine issue

of material fact."[60]  The moving party, however, need not negate the elements of the

non-movant's case.[61]  The moving party may meet its burden by pointing out "the

absence of evidence supporting the nonmoving party's case."[62]

If the moving party meets its initial burden, the non-movant must go beyond the

pleadings and designate specific facts showing that there is a genuine issue of material

fact for trial.[63]  "An issue is material if its resolution could affect the outcome of the

---

[58]     *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d
         1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers
         Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002).

[59]     FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*,
         529 F.3d 335, 339 (5th Cir. 2008).

[60]     *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005).

[61]     *See Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005).

[62]     *Duffy v. Leading Edge Products, Inc.*, 44 F.3d 308, 312 (5th Cir. 1995) (internal
         citations and quotations omitted).

[63]     *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001) (internal
                                                                              (continued...)

action.  A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[64]

In deciding whether a genuine and material fact issue has been created, the facts and inferences to be drawn from them must be reviewed in the light most favorable to the nonmoving party.[65]  However, factual controversies are resolved in favor of the non-movant "only 'when both parties have submitted evidence of contradictory facts.'"[66]  The non-movant's burden is not met by mere reliance on the allegations or denials in the non-movant's pleadings.[67]  Likewise, "conclusory allegations" or "unsubstantiated assertions" do not meet the non-movant's burden.[68]  Instead, the nonmoving party must present specific facts which show "the existence of a genuine

---

[63]    (...continued)
          citation omitted).

[64]    *DIRECT TV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

[65]    *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co.*, 336 F.3d 410, 412 (5th Cir. 2003).

[66]    *Alexander v. Eeds*, 392 F.3d 138, 142 (5th Cir. 2004) (quoting *Olabisiomotosho v. City of Houston,* 185 F.3d 521, 525 (5th Cir. 1999)).

[67]    *See Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 545 n.13 (5th Cir. 2002), *overruled on other grounds*, *Grand Isle Shipyards, Inc., v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009).

[68]    *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 399 (5th Cir. 2008).

issue concerning every essential component of its case."[69]  In the absence of any proof, the court will not assume that the non-movant could or would prove the necessary facts.[70]

Affidavits cannot preclude summary judgment unless they contain competent and otherwise admissible evidence.[71]   A party's self-serving and unsupported statement in an affidavit will not defeat summary judgment where the evidence in the record is to the contrary.[72]

Finally, "[w]hen evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court. Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."[73]

---

[69]   *Am. Eagle Airlines, Inc. v. Air Line Pilots Ass'n, Int'l*, 343 F.3d 401, 405 (5th Cir. 2003) (citation and internal quotation marks omitted).

[70]   *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

[71]   *See* FED. R. CIV. P. 56(e); *Love v. Nat'l Medical Enters.*, 230 F.3d 765, 776 (5th Cir. 2000); *Hunter-Reed v. City of Houston*, 244 F. Supp. 2d 733, 745 (S.D. Tex. 2003).

[72]   *See In re Hinsely*, 201 F.3d 638, 643 (5th Cir. 2000).

[73]   *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003) (internal citations and quotations omitted).

## III.   ANALYSIS

Plaintiff brings claims pursuant to Title VII, the Age Discrimination in Employment Act ("ADEA"), and 42 U.S.C. § 1983.

### A.   Title VII

Plaintiff alleges discrimination on the basis of his race and gender, as well as unlawful retaliation for his discrimination complaints.

#### 1.   Discrimination

Under the burden-shifting standard applicable to Title VII claims, a plaintiff claiming race or gender discrimination must establish a *prima facie* case by demonstrating that he or she: (1) is a member of a protected class; (2) was qualified for the position in question; (3) was the subject of an adverse employment action; and (4) was treated less favorably than similarly situated persons who were not members of the protected class.[74]   A plaintiff's *prima facie* case creates an inference of intentional discrimination that shifts the burden back to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.[75]   The defendant's burden at this stage is a burden of production, not persuasion, and "'can

---

[74]   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Lee v. Kansas City S. Ry. Co*., 574 F.3d 253, 259 (5th Cir. 2009) (race); *Bouvier v. Northrup Grumman Ship Sys., Inc.*, 350 F. App'x 917, 921 (5th Cir. 2009) (gender);  *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001) (race).

[75]   *McDonnell Douglas*, 411 U.S. at 802;  *Lee*, 574 F.3d at 259.

involve no credibility assessment.'"[76]

If the employer provides such a reason, the burden then shifts back to the plaintiff to offer evidence to demonstrate a genuine issue of material fact that "either (1) the defendant's reason is false and is a pretext for discrimination, or (2) that the employer's reason, while true, is only one of the reasons for its conduct, and the plaintiff's protected characteristic was a 'motivating factor' in its decision."[77]  Under the "motivating factor" analysis, if the plaintiff demonstrates that the protected characteristic was a motivating factor in the employment decision, the employer must then prove "that the same adverse employment decision would have been made regardless of discriminatory animus" in order to avoid liability.[78]

Despite this intermediate burden shifting, the plaintiff at all times bears the ultimate burden to demonstrate that the defendant intentionally discriminated.[79]

### a.    *Prima facie* case

A *prima facie* case under Title VII requires proof of four elements, as stated

---

[76]    *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).

[77]    *Taylor v. Peerless Indus. Inc.*, 322 F. App'x 355, 360 (5th Cir. 2009) (citing *Rachid v. Jack in the Box*, 376 F.3d 305, 312 (5th Cir. 2004)).

[78]    *Taylor*, 332 F. App'x at 360-61.

[79]    *Reeves*, 530 U.S. at 143; *Lee*, 574 F.3d at 259 n. 13 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

above.   The parties have made no argument as to the first two elements, *i.e.*, membership in a protected class and Plaintiff's qualification for his position.   The Court assumes that Plaintiff can satisfy these elements.

As for the third factor, adverse employment action, Plaintiff fails to demonstrate a genuine fact issue.   For Title VII discrimination claims in the Fifth Circuit, "'[a]dverse employment actions include only ultimate employment decisions such as hiring, granting leave, discharging, promoting, or compensating.'"[80] The employment actions about which Plaintiff complains are:

- being issued an SI in two instances, for the LSU paperwork and for failing to wear his uniform for a media interview;[81]

- being closely supervised and reprimanded for matters such as dim lights in his office and not having materials at the classes he was teaching;

- reduced efficiency ratings;[82] and,

- the involuntary transfer out of the Recruiting Unit in May 2008 to a shift

---

[80]   *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007) (quoting *Green v. Administrators of Tulane Educ. Fund*, 284 F.3d 642, 657 (5th Cir. 2002) (alteration in *McCoy*).

[81]   As stated previously, an SI is non-punitive and "is not to be considered discipline in any form or fashion."   *See* Exhibit 8 to Singer Affidavit, at 28, ¶ 8.

[82]   Buenik stated in his affidavit that performance evaluations do not affect an officer's pay increase.   Buenik Affidavit, at 1, ¶ 3.   *See Watkins v. Paulsen*, 332 F. App'x 958, 960 (5th Cir. 2009) (a low performance review, standing alone, does not suffice as an "ultimate employment decision"; without an "'objective showing of a loss in compensation, duties, or benefits,' there is no adverse employment action") (quoting *Pegram v. Honeywell, Inc*., 361 F.3d 272, 283 (5th Cir. 2004)).

that required Plaintiff to work nights and weekends.

None of these employment actions fit into the categories of "ultimate employment decisions" outlined by the Fifth Circuit.[83]  Plaintiff's allegations therefore are legally insufficient to establish an adverse employment action.[84]

Montalvo's *prima facie* case also fails on the fourth element.  Montalvo has failed to cite any evidence that he was treated less favorably than similarly situated persons who are outside his protected class (*i.e.*, women or non-Hispanics).  Although Plaintiff calls the Court's attention to two men whom he alleges also were treated badly, Barnett and Shallington, this fourth prong requires a plaintiff to submit evidence of another person who is outside the protected class and was treated *more* favorably, not another person allegedly wronged.  Plaintiff has submitted no such

---

[83]    *See McCoy*, 492 F.3d at 559.

[84]    The Court rejects Plaintiff's attempt to categorize his involuntary transfer as a constructive discharge, which in some cases qualifies as an "adverse employment action."  First, it is far from clear that a constructive discharge claim is properly before the Court, given the Court's order denying Plaintiff leave to file a third amended complaint.  *See* Memorandum and Order [Doc. # 27].  Second, a claim for constructive discharge requires a plaintiff to establish that "'working conditions [became] so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'"  *Aryain v. Wal-Mart Stores Texas, LP*, 534 F.3d 473, 480 (5th Cir. 2008) (quoting *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004)); *see McCoy*, 492 F.3d at 557; *Brown*, 237 F.3d at 566.  This test of "intolerability" requires "something more" than a hostile work environment claim.  *Aryain*, 534 F.3d at 480.  The alleged affronts to Montalvo, detailed in the Background section of this opinion, fall far short of the standard.  *See id.* at 482.

evidence supporting a claim of race or gender discrimination.[85]

Plaintiff therefore fails to establish a genuine issue of material fact regarding a *prima facie* case of race or gender discrimination.  Although this is dispositive of Plaintiff's claim, the Court will proceed to examine Plaintiff's evidence of intentional discrimination, which also fails to defeat Defendant's motion for summary judgment.

### b.    Defendant's nondiscriminatory reason

Defendant presents evidence that Plaintiff was involuntarily transferred out of Recruiting because of job performance problems, *e.g.*, refusal to accept responsibility for errors and resistance to supervision, as detailed in the Davis Memorandum and the other memoranda solicited by Buenik.[86]  This showing satisfies Defendant's burden to articulate a nondiscriminatory reason for the challenged employment action.

### c.    Intentional discrimination

Because Defendant articulated a nondiscriminatory reason, the burden shifts back to Plaintiff to establish intentional discrimination on the basis of race and gender.

---

[85]    When Plaintiff does refer to other employees who received more favorable treatment, he makes only vague assertions, without naming the other employees or providing citations to the record.  For example, Montalvo's briefing alleges that "younger, Caucasian officers received favorable treatment over [Montalvo] after they too made the same mistakes that he had made in submitted paperwork to the lead instructor of the weapons of mass destruction course to be produced to LSU.  However, there is no record of these younger Caucasian employees ever being chastised." Response, at 28.  The briefing makes no citation to the record.  *See also* Response, at 31-32.

[86]    Exhibit 5 to Buenik Affidavit (collecting memoranda regarding Montalvo's job performance).

Plaintiff asserts that he meets this burden under two standards: pretext and mixed motive.  Under the pretext standard, Plaintiff has the ultimate burden to show that Defendant's articulated nondiscriminatory reason for Plaintiff's involuntary transfer was not Defendant's true reason, but rather was a pretext for race and gender discrimination.[87]   Under the "mixed motive" standard, Plaintiff is required to demonstrate that his race or gender was "a motivating factor" for the adverse employment action.  If he does so, Defendant may avoid liability by showing "that the same adverse employment decision would have been made regardless of discriminatory animus."[88]

Turning first to the "motivating factor" analysis, Montalvo's argument under this doctrine is that, assuming he made the alleged mistakes in the LSU paperwork, Sergeant Poor did not "follow up" with any other officers who made similar mistakes, and that some other officers making mistakes were "no doubt . . . younger and Caucasian."[89] Plaintiff also complains that Sergeant Poor and Captain Lentschke, both of whom are women, continued to write negative comments in his evaluation after he

---

[87]     *Id.* at 143.

[88]     *Taylor*, 322 F. App'x at 360-61.

[89]     Response, at 32.  Plaintiff provides no citation to the record and does not identify any other persons who made mistakes in their paperwork.

was shielded in Recruiting, and appears to argue that their participation in his job assessment is evidence of illegal discrimination.[90]   These assertions from Plaintiff do not demonstrate a genuine fact question that is material to the issue of whether or not race or gender motivated the employment action at issue:  Montalvo's involuntary transfer out of Recruiting.[91]   Moreover, even if Plaintiff could demonstrate that race or gender discrimination was "a motivating factor," which he has not, the memoranda collected by Buenik demonstrate without contradiction that Defendant would have made the decision to involuntarily transfer Montalvo regardless of any discriminatory motive.   Montalvo has not produced any evidence suggesting that Defendant's decision to transfer him out of Recruiting was made for any reason other than his poor job performance.   The Court will not second-guess what Defendant has shown,

---

[90]   Response, at 32.  Again, Plaintiff provides no citation to the record.  He presumably is referring to memoranda in response to Buenik's request in May 2008 for documentation supporting Montalvo's involuntary transfer.  *See* Exhibit 5 to Buenik Affidavit.  As explained by Buenik, Montalvo remained "on the books of his permanent assignment" at the Academy while he was shielded in Recruiting.  Reply Affidavit of Assistant Chief of Police George Buenik (Appendix II to Reply), at 2, ¶ 4.  It was standard and appropriate for all supervisors who were responsible for Plaintiff during the rating period to participate in his performance evaluation.  *Id*. Plaintiff provides no evidence to the contrary.

[91]   The dispute over the LSU paperwork occurred in August 2007, months before Plaintiff was transferred—at his request—away from the Training Academy and into Recruiting.  The employment action relevant to Plaintiff's discrimination claims is Montalvo's transfer *out* of the Recruiting Unit to a patrol assignment.

without contradiction, to be Buenik's opinion of Plaintiff's deficient performance. [92]

Moreover, to the extent that Plaintiff relies on his subjective belief that Defendant's actions were motivated by race or gender discrimination, such subjective belief is insufficient to defeat summary judgment.[93]

By the same reasoning, Plaintiff's argument under the pretext standard also must fail. Defendant has produced evidence of a legitimate, nondiscriminatory reason for Plaintiff's involuntary transfer and Plaintiff fails to demonstrate a fact question material to the issue of whether race or gender discrimination, rather than Defendant's stated reason, was the true motivation for the transfer. When making his argument regarding pretext, Plaintiff asserts that, because Buenik solicited the memoranda that were critical of Montalvo's job performance, the memoranda somehow were inadequate to support Buenik's decision to transfer Montalvo.[94] Plaintiff cites no

---

[92]    *See Little*, 924 F.2d at 97 ("[E]ven an incorrect belief that an employee's performance is inadequate constitutes a legitimate, non-discriminatory reason. We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue.")

[93]    *Moore v. Solar Group*, 311 F. App'x 722, 724 (5th Cir. 2009) (citing *Bauer v. Albemarle Corp*., 169 F.3d 962, 967 (5th Cir. 1999)).

[94]    Response, at 30. Plaintiff also states that Buenik "admitted that he had never received any documents of reprimand, including Supervisor's Interventions from Plaintiff's direct supervisor at the Recruiting Division, Sergeant Stephen Trahan." *Id*. However, as detailed in the Background section, *supra*, the persons writing memoranda about Montalvo's job performance—especially Sergeant Davis—clearly had first-hand knowledge of Montalvo's work. The absence of a memorandum or other document
(continued...)

authority to support the argument that job performance reviews solicited by a supervisor are somehow suspect and invalid.  In fact, Buenik was obligated to ensure that, while on his temporary assignment, Montalvo's work quality continuously met the criteria for that assignment and, if his work was unacceptable, to transfer him.[95]

Because Plaintiff cites no evidence that race or gender discrimination motivated his involuntary transfer, summary judgment is granted in favor of Defendant on those claims.

### 2.    Title VII Retaliation

Title VII forbids an employer to retaliate against an employee who brings a charge of discrimination.[96]  To establish a *prima facie* case of unlawful retaliation, a plaintiff must show that: (1) the plaintiff participated in an activity protected by Title VII; (2) the employer took an adverse employment action against the plaintiff; and (3) a causal connection exists between the protected activity and the materially adverse

---

[94]    (...continued)
from Trahan does not, in itself, call into question the validity of the memoranda submitted by Defendant.  Notwithstanding the implication that Trahan would have given Plaintiff a positive review, Plaintiff has submitted no evidence from Trahan directly, nor other admissible proof about Trahan's assessment of Plaintiff's job performance.

[95]    Buenik Affidavit, at 3, ¶ 11 (citing General Order 300-02); General Order 300-02 (Exhibit 6 to Buenik Affidavit), at § 16.

[96]    42 U.S.C. § 2000e-3.

action.[97]  If plaintiff establishes a *prima facie* case, the employer must articulate a legitimate, nondiscriminatory reason for its employment action.  Once the employer does so, the burden shifts back to the plaintiff to demonstrate that the Defendant actually was motivated by retaliation.[98]

The Fifth Circuit ruled recently in *Smith v. Xerox* that a plaintiff relying on circumstantial evidence may prove Title VII retaliation under a "mixed motive" theory, as well as the "pretext" theory that previously was available.[99]  Under the pretext theory, Plaintiff may carry his ultimate burden by showing that Defendant's proffered reason is a pretext for retaliation—in other words, that retaliation was the "but for" cause for the adverse action.[100]  Under the mixed motive theory, if Plaintiff shows that illegal retaliation was one reason for the adverse action, the Defendant may defend the action by establishing that "it would have made the same decision even without consideration of the prohibited factor."[101]

The Court will assume *arguendo* that Plaintiff can establish a *prima facie* case

---

[97]     *Aryain*, 534 F.3d at 484.

[98]     *Id.*

[99]     *Smith v. Xerox*, No. 08-11115, 2010 WL 1052837 (5th Cir. Mar. 24, 2010) ("motivating factor" standard); *Aryain*, 534 F.3d at 484 ("pretext" standard).

[100]    *Reine v. Honeywell Int'l, Inc.*, No. 09-30030, 2010 WL 271352, at *3 (5th Cir. Jan. 21, 2010) (citing *Septimus v. Univ. of Houston*, 399 F.3d 601, 608 (5th Cir.2005)).

[101]    *Smith*, 2010 WL 1052837, at *8.

of retaliation.  Defendant has articulated a legitimate, nondiscriminatory reason for the involuntary transfer of Plaintiff, specifically, Plaintiff's job performance problems as extensively documented in the memoranda collected by Buenik.[102]  The burden therefore shifts back to Plaintiff to establish that retaliation motivated the involuntary transfer.  Plaintiff argues that his evidence defeats summary judgment under either the pretext or the "mixed motive" standard.

Under the "motivating factor" test, assuming that Plaintiff could show that both legitimate and illegitimate reasons motivated the involuntary transfer, Defendant bears the burden to show, as an affirmative defense, that "its legitimate reason standing alone would have produced the same decision."[103]  As held above in the context of Plaintiff's discrimination claim, Buenik's impressions of the views of Plaintiff's supervisors, as evidenced by the memoranda collected by Buenik, clearly demonstrate that Plaintiff's job performance problems alone would have resulted in his involuntary transfer out of Recruiting.  Plaintiff's apparent argument that some of the information in the memoranda was stale, stating "[p]art of the alleged documented issues occurred months prior, or after Montalvo was no longer performing certain duties,"[104] is

---

[102]     *See* Exhibit 5 to Buenik Affidavit.

[103]     *Garcia v. City of Houston*, 201 F.3d 672, 676 (5th Cir. 2000).

[104]     Response, at 41.

unavailing.  Plaintiff's job performance while he was  shielded from Lentschke in Recruiting,[105] as well as his job performance at the Academy before Plaintiff requested the transfer to Recruiting, was clearly perceived to be deficient.  Plaintiff does not present non-speculative evidence to rebut Defendant's proof.   Plaintiff fails to demonstrate a genuine fact question under the motivating factor standard.

By the same reasoning, Plaintiff has failed to demonstrate a genuine issue of material fact regarding pretext.  Defendant's articulated nondiscriminatory reason is strongly supported by the Davis Memorandum and other memoranda submitted to Buenik.  A pretext is shown only if the adverse employment action would not have occurred "but for" the protected conduct.[106]  Although Plaintiff makes various challenges to Defendant's reason for the involuntary transfer,[107] Plaintiff's evidence is "not sufficient to create an issue of pretext."[108]  When considering a plaintiff's pretext evidence, the Court "is not to engage in second-guessing of an employer's

---

[105]    *See*, *e.g.*, Davis Memorandum.

[106]    *Reine*, 2010 WL 271352, at *3 (citing *Septimus*, 399 F.3d at 608).

[107]    Plaintiff alleges that Defendant's explanation of poor performance is pretextual because the memoranda criticizing his job performance were solicited by Buenik, because Buenik did not "follow up" to determine whether the statements in the memoranda were truthful, because Buenik "[did not] care[] where Plaintiff went" when he left Recruiting, and because Plaintiff's job performance had not been criticized before 2007.  Response, at 39-40.

[108]    *LeMaire v. La. Dep't of Transp. and Dev't*, 480 F.3d 383, 391 (5th Cir. 2007).

business decisions."[109]  "Our anti-discrimination laws do not require an employer to make proper decisions, only non-retaliatory ones."[110]  Plaintiff has made no showing that Defendant's true motive for the 2008 transfer was retaliatory.

Summary judgment therefore is granted for Defendant on Plaintiff's Title VII retaliation claim.

### B.    ADEA

#### 1.    Discrimination

As with a Title VII claim, an ADEA claim is evaluated under a *McDonnell-Douglas* burden-shifting framework.[111]  A plaintiff first must establish a *prima facie* case of age discrimination by demonstrating that (1) he was within the protected class; (2) he was qualified for the position; (3) he suffered an adverse employment decision; and (4) he was replaced by someone younger or treated less favorably than similarly situated younger employees.[112]  If the plaintiff does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the challenged

---

[109]    *Id.*

[110]    *Id.* (citing *Little v. Republic Ref. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)).

[111]    *Jackson v. Cal-Western Packaging Corp.*, No. 09-20411, 2010 WL 1135735, at *2 (5th Cir. Mar. 26, 2010).

[112]    *Smith v. City of Jackson, Miss.*, 351 F.3d 183, 196 (5th Cir. 2003).  *See Jackson*, 2010 WL 1135735, at *2.

action.[113]  The burden then shifts back to the plaintiff to show a genuine issue of material fact as to whether the employer's reason is a pretext for discrimination.[114] Under the ADEA, the plaintiff must show that age was the "but for" cause of the employer's adverse action.[115]

The Court assumes *arguendo* that Plaintiff satisfies the *prima facie* elements. Defendant has articulated a non-discriminatory reason for Plaintiff's involuntary transfer, in particular, Buenik's belief, based on the job performance problems documented in the memoranda collected, that Plaintiff's performance was sub-par.[116] The burden therefore shifts to Plaintiff to show that Defendant's nondiscriminatory reason is a pretext for discrimination and that, but for age discrimination, he would not have been involuntarily transferred out of Recruiting.

Plaintiff makes several vague accusations in his briefing that are relevant to age discrimination.  He asserts, without any citation to the record and without any details, that "younger" employees were treated more favorably "after they too made the same

---

[113]    *Jackson*, 2010 WL 1135735, at *3.

[114]    *Id.*

[115]    *Id.* at *2 (citing *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2351 (2009)).

[116]    *See* Exhibit 5 to Buenik Affidavit (collecting memoranda).

mistakes" that Montalvo had made in the LSU paperwork.[117] However, he provides no citation to the record, and does not provide any further detail regarding the allegedly younger officers, the mistakes they allegedly made, or the treatment they allegedly received.   He further asserts that "Sergeant Barnett and Sergeant Shallington[] were older male officers that were forced to transfer by Captain Mary Lentschke because she did not feel that they fit the image of the Training Academy."[118]  Again, this statement is not supported by a citation to the record, any non-speculative admissible proof, or any details about Barnett and Shallington.

As stated above, Plaintiff's burden under the ADEA is to show that age was the "but for" cause for Defendant's action.[119] Plaintiff has failed to demonstrate a genuine issue of material fact regarding the cause for his involuntary transfer.  His allegations of age discrimination are vague and unsupported.   In sum, Plaintiff fails to demonstrate the existence of a genuine fact question regarding the legitimacy of Defendant's decision to transfer him because of unacceptable job performance.

Summary judgment therefore is granted in favor of Defendant on Plaintiff's ADEA discrimination.

---

[117]    Response, at 28.

[118]    Response, at 29.  *See* Response, at 31 (Plaintiff alleges, without any citation to the record, that "other older males Sergeant Barnett and Sergeant Shallington were forced out of the Training Academy").

[119]    *Jackson*, 2010 WL 1135735, at *2.

### 2.    ADEA Retaliation

The Court will assume *arguendo* that Plaintiff can establish a *prima facie* case of retaliation under the ADEA.[120]   As stated above, Defendant has articulated a legitimate, nondiscriminatory reason for the adverse employment action:  Plaintiff was involuntarily transferred out of Recruiting because of Buenik's belief (based on extensive documentation) that Plaintiff's job performance was deficient.

Evaluation of a retaliation claim under the ADEA follows the Title VII analytical framework.[121]   As with his Title VII retaliation claim, Plaintiff has failed to demonstrate a genuine issue of material fact that Defendant's nondiscriminatory reason is a pretext for retaliation.  Moreover, as held above in the Title VII context, Plaintiff's job performance problems are well-documented, and Defendant has shown that it would have made the same employment decision, *i.e.,* involuntary transfer, whether or not Plaintiff had filed his EEOC Charge.

Summary judgment on Plaintiff's ADEA retaliation claim therefore is granted in favor of Defendant.

---

[120]   To establish a *prima facie* case of retaliation, a plaintiff must show (1) that he engaged in activity protected by the ADEA; (2) that an adverse employment action occurred; and (3) that a causal link existed between the protected activity and the adverse action.  *Tratee v. BP N. Am. Pipelines, Inc.*, 277 F. App'x 390, 395 (5th Cir. 2008).

[121]   *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1121-22 (5th Cir.1998).

**C.**     **Section 1983 Claim**

Montalvo's complaint invokes 42 U.S.C. § 1983, and appears to assert that the same facts supporting his claims under Title VII and the ADEA also support a claim under Section 1983.[122]   Although Defendant moves for summary judgment on the Section 1983 claim, Plaintiff's briefing fails to address the issue.

A municipality is liable under Section 1983 for "a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy."[123]  Plaintiff has presented no specific facts supporting his Section 1983 claim. In the absence of any proof, the Court will not assume that the Plaintiff could or would prove the necessary facts.[124]  Moreover, Plaintiff's summary judgment burden is not met by mere reliance on the allegations in his pleadings.[125] "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment."[126]

---

[122]   Second Amended Complaint [Doc. # 7], at 3 ¶ 11("The discrimination and retaliation against Mr. Montalvo, as detailed above, violate his rights under 42 U.S.C. § 1983, 42 U.S.C. §2000e, *et seq.* (Title VII of the Civil Rights Act), and 29 U.S.C. § 621, *et seq.* (the [ADEA]).")

[123]   *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984).

[124]   *Little*, 37 F.3d at 1075.

[125]   *Diamond Offshore*, 302 F.3d at 545 n.13.

[126]   *Malacara,* 353 F.3d at 405.

Because Plaintiff has failed to demonstrate a genuine issue of material fact as to his Section 1983 claim, summary judgment is granted for Defendant.

## IV.   CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that Defendant's Motion for Summary Judgment [Doc. # 40] is **GRANTED**.  All Plaintiff's claims are dismissed with prejudice.

A separate final judgment will issue.

SIGNED at Houston, Texas, this **12th** day of **May, 2010**.

Nancy F. Atlas
United States District Judge